[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, the Golden Hill Paugussett Tribe ("the tribe"), filed its seconded amended complaint on May 31, 1996, naming as the defendant Governor John G. Rowland. The complaint alleges that, despite the tribe's willingness to enter into a trust agreement with the governor in March 1991, the governor's office has been unwilling to enter into such an agreement, thereby violating the terms of General Statutes § 47-66h. The complaint seeks a writ of mandamus compelling the governor to begin negotiation with the tribe as mandated by General Statutes § 47-66h
The defendant in its answer dated June 10, 1996, does not admit knowledge of any willingness on the part of the plaintiff to enter into a trust agreement, but does admit contact by a representative of the tribe, Moon Face Bear, on March 20, 1991. The defendant also raises the following three special defenses: (1) General Statutes § 47-66h is unconstitutional; (2) General Statutes § 47-66h violates the principle of separation of powers and improperly interferes with the executive branch; and (3) the Indian Affairs Task Force (the "task force") failed to issue a final report containing trust agreement recommendations, a condition precedent to the governor entering into a trust agreement according to the terms of General Statutes § 47-66h The plaintiff denied all three of the defendant's special defenses on June 17, 1996.
As per the scheduling order of May 20, 1996, as amended on August 8, 1996, the court now addresses the merits of the defendant's third special defense, i.e., the lack of trust agreement recommendations in the final report of the task force.[1]
To prevail in an action for mandamus, the plaintiff must establish three elements: "(1) that the plaintiff has a clear legal right to the performance of a duty by the defendant; (2) that the defendant has no discretion with respect to the performance of that duty; and (3) that the plaintiff has no adequate remedy at law." Town of Stratford v. State Board of Med. Arb., 239 Conn. 32, 44, 681 A.2d 281 (1996). "`Mandamus is an extraordinary remedy.' . . . `Mandamus neither gives nor defines rights which one does not already have. . . . It acts upon the request of one who has a complete and immediate legal right; it cannot and does not act upon a doubtful and contested right.'Sterner v. Saugatuck Harbor Yacht Club, Inc., 188 Conn. 531,533-34, 450 A.2d 369 (1982). The plaintiff in an action for a CT Page 6807 writ of mandamus bears the burden of proving the `deprivation of a `clear legal right" that warrants the imposition of such an extraordinary remedy. Light v. Board of Education, 170 Conn. 35,38, 364 A.2d 229 (1975)." (Citation omitted.) Honan v. Greene,37 Conn. App. 137, 143, 655 A.2d 274 (1995).
General Statutes § 47-66h(a) provides: "Effective October 1, 1990, the Governor shall enter into a trust agreement with each willing indigenous Indian tribe. Any such trust agreement shall define the powers and duties possessed by the tribe that is party to the agreement and shall be consistent withrecommendations on trust agreements contained in the final report
of the Indian Affairs Task Force made pursuant to special act 87-103." (Emphasis added.) The task force issued a total of three reports, one in 1989, 1990 and 1991. All three reports are admitted into evidence as full exhibits for consideration by the court.
The court will first discuss the lack of trust agreement recommendations in the final report of the task force. The court will then proceed to address why the lack of trust agreement recommendations in the final report precludes the granting of a writ of mandamus.
I. Lack of trust agreement recommendations in the final report of thetask force
This court previously provided some background as to the issue of what constitutes the final report" of the task force as used in General Statutes § 47-66h in its decision of April 24, 1997. (Memorandum of Decision on Plaintiff's Motion in Limine.) The court will now restate the background provided in that decision.
At the core of the parties' dispute in the present case is the meaning of "final report" as used in General Statutes §47-66h. The plaintiff would have the court construe "final report" to mean that report by the task force which provides conclusive recommendations on the trust agreement issue. The plaintiff argues that the task force was directed to address numerous important issues, including the nature of future trust agreements between the state and Connecticut tribes. According to the plaintiff, the task force's decisive recommendations as trust agreements were set forth in its 1990 report; thus, the plaintiff argues, for purposes of General Statutes § 47-66h, the 1990 CT Page 6808 report is the "final report." The defendant, by contrast, argues that the term "final report" means the last report in a chronological sequence, that is the 1991 report of the task force. According to the defendant, the fact that the task force did not make recommendations about trust agreements in the 1991 report cannot alter the plain meaning of "final," regardless of any negative implications this strict construction may have on the plaintiff. Applying this reasoning, pursuant to the dictates of General Statutes § 47-66h, the defendant insists that the parties may not look to either the 1989 or 1990 report for recommendations about trust agreements.
The word "final" has two alternative meanings: (1) being the last in a series, process or progress", synonymous with "last"; Merriam Webster's Collegiate Dictionary 436 (10th ed. 1995); or (2) "last, conclusive, decisive, definitive, terminated, completed." Black's Law Dictionary 579 (5th ed. 1979).
The Indian Affairs Task Force was created in 1987 pursuant to special act 87-103. This act charged the task force with a list of topics for study and recommendation, including, but not limited to: title to reservation land; state responsibility for reservations; the jurisdiction of criminal and civil law on reservations; the legal process for determining tribal membership; the imposition of state and local taxes on reservations and tribes; and access to sacred sites. The task force issued its first report in 1989.
The 1989 report was submitted to the general assembly and its recommendations were adopted in some form into Public Act 89-368. This public act extended the life of the task force for another year, specifically until February 1, 1990, by which time the task force must "submit a report of its study and recommendations to the governor or general assembly. . . ." Public Acts 1989, No. 89-368. During the hearings on P.A. 89-368, it became evident that one reason for extending the life of the task force was because the task force had not yet completed its inquiry into possible trust agreements with the state.[2] Public Act 89-368, § 28, in extending the life of the task force, thereby directed the task force to inquire as to the "description and review of trust agreements." The extension of the task force's life to examine the issue of trust agreements in 1989 thus suggests to this court that the original 1989 report was not conclusive as to the task force's recommendations on trust agreements. CT Page 6809
In February 1990, the task force submitted its second report, which again made a series of recommendations to the state legislature, including some about trust agreements.[3]
Beginning in March 1990, the joint committee on the environment began to hear testimony for House Bill 6000, eventually passed as special act 90-25. This special act again extended the life of the task force. Special act 90-25 enumerates the areas the task force should continue to study, including the "review and analysis of the trust agreement process."[4] The plaintiff would have the court construe this language in the special act not as an extension to make recommendations about trust agreements, but as an extension to examine the trust agreement negotiations that the task force ostensibly predicted would ensue in light of the 1990 report.[5] The court finds this argument unpersuasive. Instead, the language of special act 90-25 suggests to the court that the task force's work as to the study of trust agreements was not yet complete.
In ruling upon the plaintiff's motion in limine, the court found that it could not determine the meaning of "final report" based solely on statutory construction and a review of the legislative history, and therefore admitted into evidence relevant extrinsic evidence that shed light on the issue of what constitutes the "final report" as used in General Statutes §47-66h. (See Memorandum of Decision on Plaintiff's Motion in Limine, April 24, 1997; Memorandum of Decision on Defendant's Motion in Limine, May 13, 1997.)
This extrinsic evidence implies that the term "final report" as used in General Statutes § 47-66h refers to the last chronological report of the task force, i.e., the 1991 report. The documents contained in defendant's Exhibit 3, all intra-task force documents dated summer-fall 1991, discuss the continuing need for a final report of the task force.[6] The plaintiff has not provided any convincing reason as to why the task force would employ the term, "final report," in these documents in a manner inconsistent with its usage in General Statutes § 47-66h
Accordingly, this court finds that the references to a "final report" in Exhibit 3 correspond to the "final report" mentioned in General Statutes § 47-66h. Defendant's Exhibit 5 also suggests that the 1990 report was not "final" for purposes of General Statutes § 47-66h.[7] Lastly, in defendant's Exhibit 4, admitted as an inconclusive evidentiary admission CT Page 6810 rather than a binding judicial admission; (see Memorandum of Decision on Plaintiff's Motion in Limine, April 24, 1997); the plaintiff, in response to interrogatories, stated that the final report of the task force was not submitted to the governor and the general assembly until November 21, 1991.[8] The plaintiff's responses to all three interrogatories were the same, suggesting that the plaintiff interprets the word "final" to mean "latest" or "last in a series," i.e., the 1991 report, rather than meaning "conclusive" or "decisive." Accordingly, this court finds that the plaintiff's arguments that it did not interpret interrogatory #2(b) to incorporate the term "final report" as a legal term of art as used in General Statutes § 47-66h to be unpersuasive. (See Plaintiff's Amended Responses to Interrogatories, January 31, 1997.)
Finally, the plaintiff, interpreting "final" to mean "conclusive" or "decisive," relies on Exhibit C to Exhibit 2, a letter from Representative Thompson to Governor Weicker, dated February 22, 1991, which states in relevant part: "The Task Force believes that Public Act 89-368 was important and far-reaching legislation concerned with relationships between the State, of Connecticut and its indigenous Native American tribes. As a consequence, all issues that were referred to us were discussed, but at this time the Task Force has decided not to initiate any new or remedial legislation. Instead, the Task Force will recommend to the Program Review Committee that it undertake a review of the Connecticut Indian Affairs Council. The Task Force has not changed its previous recommendations on the other matters referred to us, and therefore did not see a need to restate them. Those recommendations will need further deliberation by committees of cognizance in the General Assembly."
The court finds that Exhibit C to Exhibit 2 insufficient to prove that "final" as used in General Statutes § 47-66h
denotes "decisive" or "conclusive" in part because: (1) Exhibit C to Exhibit 2 relies on Representative Thompson's belief that the task force can incorporate the recommendations as to trust agreements contained in the 1990 report into the 1991 report, yet, there is no statutory basis for this belief; (2) the letter states the opinion of Representative Thompson alone without any indicia that the letter or its contents were adopted by the entire task force, thus decreasing the weight of this document in the court's view; and (3) the actual 1991 report does not state that it incorporates by reference the recommendations of the 1990 report, despite the sentiment shared by Representative Thompson CT Page 6811 in plaintiff's Exhibit C to Exhibit 2.
In light of the above findings concerning the statute, legislative history, and extrinsic evidence, the court finds that the term "final report" as employed by General Statutes §47-66h refers only to the last chronological report of the task force, the 1991 report. The court further finds that this "final," 1991 report of the task force did not contain any recommendations as to trust agreements as required under General Statutes § 47-66h.[9]
The court will now explain why the lack of trust agreement recommendations in the final report precludes the imposition of a writ of mandamus.
II. A writ of mandamus may not issue in the absence of trust agreementrecommendations in the final report
To reiterate the standard stated previously, a mandamus may issue only when "one who has a complete and immediate legal right; it cannot and does not act upon a doubtful and contested right." Honan v. Greene, supra, 37 Conn. App. 143. The plaintiff bears the burden of proving the need for a mandamus. Id. "Even satisfaction of [the test for a mandamus] does not . . . automatically compel issuance of the requested writ of mandamus. . . . In deciding the propriety of a writ of mandamus, the trial court exercises discretion rooted in the principles of equity." Hennessey v. Bridgeport, 213 Conn. 656, 659,569 A.2d 1122 (1990).
This court finds the existence of recommendations in the "final report" of the task force a condition precedent to the issuance of a writ of mandamus.[10]" Although General Statutes § 47-66h provides that the governor "shall enter into a trust agreement," the commencement of negotiations with a willing tribe would be futile because the statute further provides that the trust agreements "shall be consistent" with the trust agreement recommendations in the final report of the task force. Without such recommendations as a template for and during negotiations, the ensuing trust agreement would be invalid.
"Even though the plaintiff has a legal right to the matter sought, the writ will not issue, if that right be nothing more than a naked right. In addition to a bare legal right, [the plaintiff] must have a proper interest in, and a proper purpose CT Page 6812 to be served by, the doing of the act sought to be ordered. . . . If the right sought to be forced is or has become a mere abstract right, the enforcement of which will be of no substantial or practical benefit to the petitioner, the writ will not issue though otherwise the applicant would be entitled to it." Sotirev. Stamford, 19 Conn. App. 505, 514, 563 A.2d 1021 (1989); Papev. McKinney, 170 Conn. 588, 595, 368 A.2d 28 (1976).
The court concludes that in seeking this court to issue a writ of mandamus ordering the governor to begin negotiations for a would-be invalid contract due to the lack of trust agreement recommendations in the final report, the plaintiff is seeking the enforcement of a "naked right." Accordingly, the request for a writ of mandamus is denied.
CONCLUSION
This court finds that (1) any trust agreement entered into by the governor "shall be consistent" with the trust agreement recommendations in the final report; General Statutes § 47-66h; (2) the final 1991 report of the task force does not provide any recommendations about trust agreements; and (3) without any trust agreement recommendations in the final report, any negotiation of a trust agreement would be futile because the resulting contract would be invalid due to the failure to comply with General Statutes § 47-66h. Accordingly, the plaintiff has failed to demonstrate the deprivation of a clear positive right to a writ of mandamus. As such, the plaintiff's request for a writ of mandamus is hereby denied.
Hennessey, J.